Roy S. **MATTHEWS**, Plaintiff,

v.

Jo Anne B. **BARNHART**, Commissioner of Social Security, Defendant.

Civil Action No. 03–M–14–N.

United States District Court, M.D. Alabama, Northern Division.

Dec. 4, 2003.

Micki Beth Stiller, Law Office of Micki Beth Stiller, Montgomery, AL, for Plaintiff.

R. Randolph Neeley, Kenneth E. Vines, Leura Garrett Canary, Montgomery, AL, for Defendant.

## MEMORANDUM OPINION

McPHERSON, United States Magistrate Judge.

Claimant Roy Matthews (hereinafter referred to as "Matthews") applied for disability insurance benefits pursuant to Title II of the Social Security Act ["the Act"], 42 U.S.C. §§ 401 et seq. and for supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. § 1381 et seq. alleging that he was unable to work because of a disability. His application was denied at the initial administrative level. The plaintiff then requested and received a hearing before an Administrative Law Judge ("ALJ"). Following the hearing, the ALJ also denied the claim. The Appeals Council rejected a subsequent request for review. The ALJ's decision consequently became the final decision of the Commissioner of Social Security (Commissioner).[1] *See Chester v. Bowen,* 792 F.2d 129, 131 (11th Cir.1986).

On 6 January 2003, the claimant filed the instant action (Doc. # 1) and the case is now before the court for review pursuant to 42 U.S.C. §§ 405(g) and 1631(c)(3).

Pursuant to 28 U.S.C. § 636(c), the parties have consented to entry of final judgment by the United States Magistrate Judge. Based on the court's review of the record in this case and the briefs of the parties, the court concludes that the decision of the Commissioner should be REVERSED and this case REMANDED to the Commissioner for further proceedings not inconsistent with this opinion for the reasons set forth herein.

## I. PROCEDURAL BACKGROUND AND FACTS

Matthews was born on 2 March 1949 and was 50 years old when the administrative hearing was decided (R. 29). He has a high school education (R. 13) and past relevant work experience as a material handler and a truck driver (R.13). Matthews alleges a disability onset date of 11 June 1998 (R. 94) due primarily to Stevens Johnson Syndrome (R.102). At issue is whether the Commissioner committed reversible error when failing to consider Matthews' "borderline intellectual functioning" as a severe impairment. The claimant contends that, if it were considered in combination with his physical and mental limitations imposed by other severe impairments, it would meet the equivalent of a listed impairment within the meaning of the Act.

## II. STANDARD OF REVIEW

The standard of review of the Commissioner's decision is a limited one. Reviewing courts "may not decide the facts anew, reweigh the evidence, or substitute our judgment for that of the [Commissioner]." *Miles v. Chater,* 84 F.3d 1397, 1400 (11th

---

1. Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103–296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commissioner of Social Security.

Cir.1996) (citing *Bloodsworth v. Heckler,* 703 F.2d 1233, 1239 (11th Cir.1983)). This Magistrate Judge must find the Commissioner's factual findings conclusive if they are supported by substantial evidence.[2] *Graham v. Apfel,* 129 F.3d 1420, 1422 (11th Cir.1997). "There is no presumption, however, that the Commissioner followed the appropriate legal standards in deciding a claim for benefits or that the legal conclusions reached were valid." *Miles v. Chater,* 84 F.3d at 1400 (citations omitted).

In determining whether the Secretary's decision is supported by substantial evidence, a reviewing court must scrutinize the record as a whole and evaluate each of the four types of evidence deemed critical to a fair assessment of a claimant's case. *See Boyd v. Heckler,* 704 F.2d 1207 (11th Cir.1983). Those four types of evidence are:

1.  objective medical facts and clinical findings;

2.  the diagnoses of examining physicians;

3.  subjective statements made by the claimant and by corroborating witnesses;

4.  the claimant's age, education and work history.

## III. DISCUSSION

### A. Standard for Determining Disability

An individual who files an application for Social Security disability benefits must prove that he is disabled. *See* 20 C.F.R. § 416.912 (1999). The Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven that he is disabled. *See* §§ 20 C.F.R. 404.1520(a)-(f), 416.920(a)-(f).(1999). The ALJ must evaluate the claimant's case using this sequential evaluation process, *Ambers v. Heckler,* 736 F.2d 1467, 1469 (11th Cir.1984), and the steps are as follows:

1.  Is the person presently unemployed?

2.  Is the person's impairment severe?

3.  Does the person's impairment meet or equal one of the specific impairments set forth in 20 C.F.R. Pt. 404, Subpt. P, App. 1?

4.  Is the person unable to perform his or her former occupation?

5.  Is the person unable to perform any other work within the economy?

An affirmative answer to any of the above questions leads either to the next question, or, on steps three and five, to a finding of disability. A negative answer to any question, other than step three, leads to a determination of "not disabled." *McDaniel v. Bowen,* 800 F.2d 1026, 1030 (11th Cir.1986).

### B. The ALJ's Findings

In the instant matter, the ALJ made the following findings within the structure of the sequential evaluation process as outlined above:

---

**2.** In *Graham v. Apfel,* 129 F.3d at 1422, the Court of Appeals has stated that:
    Substantial evidence is described as more than a scintilla, and means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *See Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 842 (1971).

1. Matthews has not engaged in any substantial gainful activity since the onset date of his alleged disability.

2. Matthews has the following "severe" impairments: status-post Stevens–Johnson syndrome; eczematous dermatitis; dry eyes, secondary to Stevens–Johnson syndrome; reactive depression; and degenerative disc and spondylosis at C3–4, C5–6, and C6–7.

3. Matthews' impairments, whether considered individually or in combination, do not meet or equal any impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.[3]

4. Matthews' physical residual functional capacity permits him to perform some work that is available in significant numbers in the national economy.

### C. Application of the Standard to the Claimant

Based upon the ALJ's finding, the claimant survives the first two steps of the sequential evaluation process, because he is not engaged in "substantial gainful activity" and he has conditions that are "severe." However, the claimant does not survive step three, because the ALJ concluded that the combinations of his determined impairments were not sufficiently severe to meet or equal the severity of any listed impairment set forth in the governing regulations (R. 26–27). The ALJ continued his analysis nonetheless to evaluate the claimant's functional limitations in order to determine whether the limitations are truly disabling within the meaning of the Act.

### D. Examination and Testing Outcomes

The records reflects intermittent treatment of Matthews for various complaints at the Veteran's Administration Medical Center ["the VA"] between 29 October 1992 and 18 February 1999 (R.351–415). The record reflects that Matthews was treated by a number of physicians. However, the primary medical opinion in this case was provided by a consulting psychologist, Dr. Guy Renfro. The substance of this report and the consideration given this report are therefore the focus of the court's analysis.

### E. Matthews' Claim

Matthews was admitted to the VA on 13 June 1998 and treated for acute pharyngitis (R.160). While there, he had an allergic reaction to a medication, Rocephin. Nonetheless, he was released on 15 February 1998 (R.142). Matthews was subsequently confined at the VA from 17 June 1998 until 6 July 1998, however. During that time, he was treated for his reaction to Rocephin and for Stevens Johnson Syndrome. On 17 July 1998, he filed an application for disability.

As part of his evaluation to determine disability, a battery of tests were performed, some of which were designed to yield an objective assessment of his mental and communicative state. One of these tests produced evidence that Matthews had an overall IQ of 71, considered as "borderline intellectual functioning." Matthews alleges that the ALJ did not properly take this assessment into consideration. The court agrees.

### F. Analysis of the Dispute

At issue is whether the Commissioner improperly failed to include borderline

---

**3.** As a result of this finding, the evaluation could end and the ALJ could conclude that Burkett is not entitled to benefits within the meaning of the Act.

mental illness as a severe impairment as a result of Matthews' IQ score attained on the WAIS–III exam. More specifically, did the Commissioner erroneously failed to consider Matthews' IQ of 71 in combination with his other listed impairments for the sake of determining disability? The issue turns directly on whether the ALJ's rejection of Dr. Renfro's assessment of Matthews' mental state was improper.

### 1. Applicable Law—and Global Assessment Functioning ("GAF")

According to 20 C.F.R. Part 404, Subpart P, Appendix 1 § 12.05:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period ... The required level of severity for this disorder is met when the requirements in A, B, C, *or* D are satisfied

> .   .   .   .   .

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing additional and significant work-related limitation of function; OR

> D. A valid verbal, performance, or full scale IQ of 60 through 70 resulting in at least two of the following:

> 1. Marked restriction of activities or daily living; or

> 2, Marked difficulties in maintaining social functioning; or

> 3. Marked difficulties in maintaining concentration, persistence, or pace; or

> 4. Repeated episodes of decompensation, each of extended duration.

Importantly, "[t]he [Commissioner]'s own rulings establish that an I.Q. of 80 or more is not a severe impairment. Soc. Sec. Rul. 82–54, 1982 Cumulative Social Security Rulings 132. At the least, there-fore, an I.Q. below 80 may be a severe impairment." *Edwards v. Heckler,* 755 F.2d 1513 (11th Cir.1985).

With regard to GAF assessment, a GAF score of 51–60 identifies moderate symptoms or moderate difficulty in social, occupational or school functioning. *See* American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 32 (4th edition 1994); *see also Newland v. Apel,* 1999 WL 435153, 1999 U.S. LEXIS App. 13988 (6th Cir.1999). However, a GAF of 41 through 50 is characterized by *serious* symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). *See American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.1994); *see also Wallace v. Barnhart,* 256 F.Supp.2d 1360, 1364 (S.D.Fla.2003).

### 2. Treatment of an Examining Doctor's Opinion

On 1 September 1999, Dr. Renfro met with Matthews for over one hour. On that date, he performed a psychological evaluation of Matthews, including the Kincannon Mini Mult form of the Minnesota Multiphasic Personality Inventory ["MMPI"] and the WAIS–III. He also completed a Supplemental Questionnaire as to Residual Functional Capacity (R.6). Based on his professional opinion derived from his observations, Dr. Renfro made the following findings:

***SUMMARY, DIAGNOSTIC IMPRESSION, AND RECOMMENDATIONS***

.   .   .   .   .

The results of the testing with the WAIS–III find Roy Matthews to have a verbal IQ of 73, a Performance IQ of 74 and a Full Scale IQ of 71. All of these

scores fall within the borderline range of intelligence. Personality testing with the MMPI reveals that Mr. Matthews is experiencing depression. This depression is manifested in irritability, depressed mood, low energy level, and disturbance in sleep functioning ... Based on the results of the current evaluation the following psychological diagnoses appear most appropriate:

**DSM–IV DIAGNOSES**

Axis I Major Depression

Axis II Borderline Intellectual Functioning

Axis III Steven's Johnson Syndrome

Axis IV Psychosocial Stressors: caring for aged mother, health problems, unemployment

Axis V Current GAF 50

(R.436).

■ The claimant contends that "the fact that [he] was found to have 'borderline intellectual functioning' was not considered by the ALJ" (Doc. #14, p. 1). As an *examining psychologist,* Dr. Renfro opined that Matthews has "borderline intellectual functioning" (R.436). The ALJ rejected this opinion (R.17). As a matter of law, if an ALJ gives less than substantial weight to the treating physician's opinion, he must show "good cause" for doing so. Failure to do so is reversible error. *MacGregor v. Bowen,* 786 F.2d 1050, 1053 (11th Cir.1986).

A similar preference for the opinions of treating doctors is found in the Commissioner's regulations:

> Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations or brief hospitalizations.

20 C.F.R. § 404.1527(d)(2).

■ In the court's opinion, the ALJ did not articulate good cause for giving less than substantial weight to Dr. Renfro's opinion. In spite of Dr. Renfro's findings, the ALJ accepted the diagnostic conclusions of Dr. Sack, a non-examining psychologist who was consulted at the hearing. In relevant part, the exchange between Dr. Sack and the ALJ as well as the exchange between Dr. Sack and the claimant's counsel was as follows:

A I'm sorry. Are you asking me if I take Dr. Renfro's RFC?

Q Well, I just want you to use the form.

A The form, okay.

Q Just use the form without consideration [of] what he did.

A Okay. So based on my opinion in reading of the file—

Q Right.

A —the B criteria of the—of this psychiatric review technique—

Q Right.

A —would he have anything higher than a moderate?

Q Right.

A No.

Q On any of those—

A No.

. . .

EXAMINATION OF MEDICAL EXPERT BY ATTORNEY

Q Dr. Sack ... Okay. Dr. Renfro is a well-trained and high respected clinician in this city?

A Yes, he is.

Q And it was his assessment based on the hour plus that he evaluated [Matthews] that this fellow would have difficulty with work related activities based on his completion of the mental residual functional capacity.

A Based on his assessment, yes.

Q Okay. What reason would you state for disagreeing with Dr. Renfro's assessment then that Mr. Matthews would have a mildly severe inability to response to customary work pressure?

A Because Dr. Renfro has some inconsistencies in his report in that he rated him as having a moderate level of depression. He said that the affect was only slightly somewhat depressed and somewhat restricted and those are inconsistent with such a severe rating.

Q Well, a person can have a mildly severe to a severe restriction in customary work pressure and they could perhaps not even be at all depressed. I mean they have some other aspects such as irritability, which is—that's under anxiety, isn't it?

A I mean it could be put under lots of categories.

Q I'm saying depression is not the be all, end all of completing a supplemental RFC. Isn't it the totality of his opinion of how this person could function in these capacities that he was rating them?

A Well, he would have to base it on, his rating on this like the diagnosis. And his diagnosis was borderline IQ and depression.

Q Okay. Now what impact do you rate that? If he doesn't squarely meet 1204 might it not be reasonable to say that based on his borderline intellectual functioning that he might, in fact, medically equal o[r] psychologically equal 1204 when the borderline of in-

tellectual functioning is added to the equation?

A I don't believe so.

Q **But you would concede that an assessment of 50 on the level assessment of functioning equates to series symptoms which leads to a seri[e]s [of] symptoms which leads to a serious impairment of social, occupational and school functioning, for example, unable to keep a job?** *(Emphasis added)*

A **I would agree with the first part of that, that it's saying yes, serious problems.** *(Emphasis added)*

Q **Okay. But you've never, other than seeing some records, you've never meet this man. You've never evaluated him in anyway other than to comment on what you've heard today and to review some records. Is that correct?** *(Emphasis added)*

A **Correct.** *(Emphasis added)*

(R.50–52).

During this testimony, Dr. Sack agreed that Dr. Renfro is "well-trained" and "highly respected." He further agreed that Dr. Renfro's conclusion regarding Matthews' difficulty with work-related activities was based on the mental residual functional capacity study performed when Dr. Renfro examined Matthews. Moreover, when confronted by Matthews' counsel on the importance of the totality of a provider's observations, Dr. Sack acknowledged that "[w]ell, he [Dr. Renfro] would have to base it on his rating on this like the diagnosis."

Of great import to the court is the fact that Dr. Sack never saw or evaluated Matthews beyond a review of records provided him and observed him only at the administrative hearing. Nevertheless, Dr. Sack acknowledged the respect that Dr. Renfro enjoys among his peers, and further ac-

knowledged that if Dr. Renfro's findings were presumed true, as they should be, Matthews would have serious problems functioning on a job.

If the evidence establishes that Dr. Renfro is a "well-trained" and "highly respected" clinical psychologist who administered objective exams and drew diagnostic conclusions based on his professional training, one can presume that the test results are valid ones. In addition to the above findings, Dr. Sack also conceded that a GAF of 50 was indicative of "serious problems." His testimony was corroborated by the vocational expert, Marcia Schulman ["Schulman"].

According to Schulman, if Dr. Renfro's opinion were accepted, Matthews would not be able to perform his previous work or any other work available in the national economy (R.64). Below is an exchange between the vocational expert and the ALJ that supports this point:

Q   All right. Now I want you to take into consideration together with that his opinion that the global assessment of functioning would be at 50. The mental aspect them, if we ask you to assume those limitations as expressed by Dr. Renfro would such a person be capable of the Claimant's past relevant work or any other work?

A   Not based on that hypothetical he would not, one would not be able to do past work or other work (emphasis added).

Q   But there are probably several rationales that could be given, but with one of them being that he could not maintain the required persistence of pace and concentration to do work?

A   Yes, that would be one and work pressure, response to customary work pressure, and social interaction and functioning

In **rejecting** Dr. Renfro's opinion regarding Matthews' depressive state and rather **accepting** the opinion of Dr. Sack, the ALJ failed to address Dr. Renfro's finding of borderline intellectual functioning as indicated by Matthews' overall IQ of 71. Further, the ALJ discredited the claimant's testimony of disabling pain and functional restrictions, although the claims were, in great part, substantiated by Dr. Renfro's findings. Specifically, the ALJ stated:

I reject Dr. Renfro's assessment as it is not supported by his own analysis, nor by the remainder of the medical evidence of record. For example, VA records characterized the depression as "reactive" (Exhibit 8F, p. 33) as opposed to "major" and Dr. Renfro himself characterized the "major" depression as single episode, moderate severity. Behavior observations were noted as mild to moderate for the most part. As evidenced by the accompanying Psychiatric Review Technique form (PTRF), I conclude from the cumulative record and expert testimony that the claimant has a Global Assessment of Functioning (GAF) of 56, which according to the Diagnostic and Statistical Manual of Mental Disorders, 4th Edition, a GAF between 51 and 60 represents: "Moderate symptoms" (e.g., flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, or occupational (e.g., few friends, conflicts with peers or co-workers).

.    .    .    .    .

I find that the claimant's testimony of disabling pain and functional restrictions is disproportionate to the objective medical evidence. The record does not contain objective signs and findings that could reasonably be expected to produce the degree and intensity of pain and limitations alleged ... Moreover, there

is no evidence of an emotional component capable of producing pain of a psychogenic nature.

(R.17)

The court disagrees with the ALJ. The problem with the ALJ's conclusion is that, contrary to the clear law of this circuit, it substitutes the ALJ's opinion for that of the consulting psychologist. Testimony of an examining doctor **must** be given substantial or considerable weight unless "good cause" is shown to the contrary. *MacGregor,* 786 F.2d at 1053. While the ALJ is entitled to make credibility determinations, the ALJ may not substitute his judgment for the judgments of experts in their field of expertise.

Clinical psychologists deal with quintessentially subjective information with respect to which they must exercise professional, interpretive judgment. The Tenth Circuit has made the following observation when considering an ALJ's rejection of a behavioral science doctor's opinion because it was based, in part, on a claimant's subjective complaints:

> This remarkable conclusion is made possible only by the ALJ's tacit equation of the [psychologist's] findings with plaintiff's subjective complaints, as if the former merely parroted the latter without any medical judgment/assessment intervening. This unstated assumption is unwarranted as a professional medical matter and unsupported by any unique facts specific to this case.

*Stephens v. Apfel,* 134 F.3d 383, 1998 WL 42524 (10th Cir.1998)(Table).

Importantly, the medical evidence as supported by the testimony of a vocational expert plainly establishes that if the report of Dr. Renfro were accepted, the claimant would be considered to have an impairment or a combination of impairments which are not so slight or minimal that they would not interfere with the plaintiff's ability to perform basic work activities.

The ALJ does not address that aspect of Dr. Renfro's report wherein he discusses Matthews' borderline mental functioning (that may be considered as mild mental retardation). Further, the ALJ based his disregard for the opinion of the consulting psychologist on his conclusion that the claimant had demonstrated a lack of credibility that cast doubt on information that he gave regarding his pain. In short, the ALJ concluded that the claimant had no severe impairments that, when combined, would equal the equivalent of a listed impairment. The court concludes that the ALJ's justifications for rejecting Dr. Renfro's opinion were not supported by substantial evidence.

## IV. CONCLUSION

Therefore, it is hereby ORDERED that the decision of the Commissioner is REVERSED and this case REMANDED to the Commissioner for an evaluation of whether the Claimant's borderline intellectual functioning, when considered in association with his other severe impairments, justify a finding that the Claimant is disabled within the meaning of the Act.